# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

MAHMOUD KHALIL;

   *Plaintiff,*

v.

UNITED STATES OF AMERICA;

   *Defendant.*

Case No. 1:26-cv-04350

## COMPLAINT

## INTRODUCTION

1. Officers of the most powerful agencies of the United States government collaborated in a relentless effort to target and punish Plaintiff Mahmoud Khalil for no reason other than his constitutionally protected speech, advocacy, and association. Mr. Khalil, a lawful permanent resident ("LPR") of Palestinian descent, Columbia University graduate student and expectant father, was arrested without cause or warrant in the vestibule of his home and in front of his terrified and eight-months-pregnant wife by unnamed Immigration and Customs Enforcement ("ICE") agents, then spirited overnight and thousands of miles from family and counsel to a Louisiana ICE detention center for 104 days, until a federal judge ruled his detention presumptively unconstitutional and ordered his release. This was no ordinary arrest and detention subject to regularized administrative process or reasoned deliberation. Instead, with a target in sight who could not be charged with any actual crime, federal officials sought to weaponize the immigration process in an unprecedented manner to ensure his arrest, detention, and deportation

in order to send an *in terrorem* message to all noncitizens that advocacy in support of Palestinian rights will be punished with maximal state repression.

2. United States officials acted pursuant to a plan devised by former Trump administration officials at the Heritage Foundation, in collaboration with former and future presidential advisor Stephen Miller, designed to target non-citizen pro-Palestinian advocates on campuses for arrest and deportation. Under this plan, known as Project Esther, well-known anti-Palestinian hate groups, Betar USA and Canary Mission, were responsible for identifying targets for arrest and deportation, including Mr. Khalil, and sent his name to Secretary of State Marco Rubio for the retributive government action. Secretary Rubio issued a conclusory diktat under an obscure provision of the Immigration and Nationality Act ("INA") that Mr. Khalil's presence and activities in the United States posed serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest (the "Foreign Policy Ground" or "FPG"). That Determination, issued after Secretary Rubio received Mr. Khalil's name from the anti-Palestinian hate groups, reflected no reasoning or deliberation and instead merely parroted those groups' inaccurate smearing of Mr. Khalil as antisemitic or sympathetic to terrorism—informed only by his peaceful activism and leadership role at Columbia during the anti-genocide protests and encampment.

3. The Rubio Determination is obviously unconstitutional, as multiple federal courts—including the federal court in Mr. Khalil's habeas case—have held, as it constitutes retaliation for his First Amendment expression and is irreconcilably void for vagueness. Mindful of the dubious legality of the Rubio Determination as applied to Mr. Khalil's speech, Department of Homeland Security ("DHS") officials manufactured an additional pretextual, post-hoc charge

of misrepresentation to further entrench the possibility of his detention and removal for his pro-Palestinian advocacy.

4. The U.S. officials' plan to weaponize immigration laws and abuse the legal process was open and notorious, as was their documented collaboration with anti-Palestinian hate groups to achieve their joint objective of repressing Mr. Khalil's speech. Testimony in other federal litigation challenging what a federal court concluded was an "Ideological Deportation Policy"—designed only to repress pro-Palestinian activism—revealed the hallmarks of a conspiracy between these private malicious actors and the federal authorities who could exert their power to inflict state retribution. And Mr. Khalil was the first victim of this unlawful conspiratorial plan; various high level government officials boasted about their intentional targeting of Mr. Khalil for deportation, describing Mr. Khalil's arrest as a "blueprint" for a broader campaign to deport non-citizen campus protesters for the content of their political speech. His arrest and what can only be called arbitrary detention is supported by no legitimate legal process, but only for political repression and sensationalism.

5. Then, in the immigration proceedings controlled by U.S. officials and pursuant to the broader plan to punish and intimidate pro-Palestine activism, Mr. Khalil was subjected to a highly-irregular—indeed, sham-like—process at the direction of federal officials, who rushed to find him deportable in gross violation of longstanding procedural and substantive rules and regulations. U.S. officials aimed to further punish Mr. Khalil for his political speech by subjecting him to long-term federal detention and the application of an irregular and unfair adjudication, even if the detention and deportation were blatantly unconstitutional.

6. As a direct result of this abuse of process and related unlawful conduct by U.S. officials, Mr. Khalil was deprived of his liberty. ICE officials undertook an unlawful and

warrantless arrest of Mr. Khalil at his home, then thereafter handcuffed, shackled, and transported Mr. Khalil over long distances—from New York to Louisiana, all while denying him access to his attorney. He was imprisoned—unlawfully—in a remote ICE detention facility in Jena, Louisiana for over three months. During that time, he was separated from his wife, who was eight months pregnant at the time of his arrest. He missed the birth of his son while in detention and remained separated from his newborn for the first two months of his life and was intentionally denied permission to visit with his infant son, contrary to agency custom and regulation. Following Mr. Khalil's unlawful, retaliatory arrest and imprisonment, officials at the highest levels of the United States government publicly lashed out at Mr. Khalil on social media, labeling him a terrorist sympathizer and an antisemite. These false, defamatory charges were intentionally designed to cause—and in fact, have caused and will continue to cause—Mr. Khalil to suffer risk of physical danger, severe emotional distress, economic hardship, and damage to his reputation.

7. Mr. Khalil brings this action under the Federal Tort Claims Act ("FTCA") seeking redress for the extraordinary harms he suffered and continues to suffer at the hands of the United States government and seeks an award of damages to compensate for those harms.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b) because this is a civil action against the United States for personal injury caused by the negligent and/or wrongful acts and/or omissions of government employees.

9. This Court can enter declaratory, injunctive, and further necessary or proper relief to recognize and remedy the underlying violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief), 5 U.S.C. § 706 (agency action), and the Court's inherent equitable powers.

4

10. On July 10, 2025, Mr. Khalil submitted an administrative claim to DHS, ICE, and the Department of State ("DOS") pursuant to 28 U.S.C. § 2675(a). In a letter dated January 21, 2026, and postmarked January 22, 2026, ICE denied Mr. Khalil's administrative claims, which exhausted applicable processes with respect to those agencies, and thus fulfilled the prerequisite for the filing of this action under 28 U.S.C. § 2401(b).[1]

11. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1402(b) because it is the judicial district where Mr. Khalil resides.

**THE PARTIES**

12. Plaintiff Mahmoud Khalil is a lawful permanent resident, a Palestinian activist, and a graduate of Columbia University who was active with Columbia's Gaza Solidarity Encampment, serving as negotiator with the university. On March 8, 2025, plainclothes DHS agents arrested Mr. Khalil at his university apartment in front of his then eight-months-pregnant U.S. citizen wife. Mr. Khalil was swiftly transferred to immigration detention in Louisiana without notice to legal counsel or his wife. He was detained until June 20, 2025, when a federal court ordered his release on bail. Since his release, Mr. Khalil has been challenging his malicious and corrupted removal proceedings in various courts and has continued to suffer emotional, reputational, and other harms due to acts by officers of the United States government.

---

[1] Subsequent to the filing of that administrative complaint, officers of the Board of Immigration Appeals ("BIA"), Executive Office of Immigration Review ("EOIR"), and the Department of Justice ("DOJ") undertook numerous additional unlawful and irregular actions to control and corrupt the immigration adjudication process under their control in order to accelerate in unprecedented ways and otherwise pre-ordain an outcome of removability in Mr. Khalil's case—including actions up to June 2026. Accordingly, on July 18, 2026, Mr. Khalil filed an administrative complaint addressed to those agencies setting forth additional facts supporting claims for relief in this action. Upon exhaustion of that administrative process, Mr. Khalil intends to amend this Complaint to add facts and claims for relief relevant to those agencies' tortious conduct.

13. Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*.

14. All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, ICE, and DOS.

**STATEMENT OF FACTS**

## I.     MR. KHALIL'S BACKGROUND

15. Mr. Khalil is a thirty-one-year-old lawful permanent resident of the United States. He is married to a U.S. citizen and father to a one-year-old U.S. citizen son. He is a Muslim Palestinian who was born in Syria, where he is ineligible for citizenship. He holds Algerian citizenship but has never lived there. His grandparents were forcibly displaced from their home in Tiberias, Palestine as a result of what Palestinians refer to as the Nakba, or Catastrophe, in 1948. His grandparents took refugee status in Syria, and Mr. Khalil was born and raised in the Khan Eshieh Refugee camp near Damascus. At age 18, Mr. Khalil was forced to flee Syria to Beirut, Lebanon after two of his friends were abducted for their collective work challenging the repressive Assad regime in Syria; they were tortured and eventually killed. While in Beirut, Mr. Khalil took up construction and other work, learned English, and eventually enrolled in university there where he graduated with a computer science degree.

16. In 2022, at age 27, Mr. Khalil accepted a scholarship to attend the master's degree program at Columbia University's School of International and Public Affairs ("SIPA"), where he sought to pursue his passion for international human rights and diplomacy. He finished his coursework in December 2024. He would have attended graduation ceremonies in the spring of 2025, but was still in ICE detention in Jena, Louisiana.

17. While a student at Columbia University, Mr. Khalil attempted to raise awareness of the subjugation of Palestinians. He eventually became active in Columbia's student protest movement after October 7, 2023, when it became evident that the Israeli government, with full military and diplomatic support of the United States, was conducting a relentless military bombardment of and siege on the civilian population in Gaza. He became a lead negotiator between Columbia University's Gaza Solidarity Encampment and University administrators, frequently speaking to the press on behalf of students, and becoming a face of the student movement at Columbia at that time.

## II. THE GOVERNMENT'S PRETEXTUAL AND UNLAWFUL PLAN TO ARREST, DETAIN, AND DEPORT MR. KHALIL IN ORDER TO INTIMIDATE AND SILENCE HIM AND OTHER PRO-PALESTINE ACTIVISTS.

18. The decision to arrest, detain, and attempt to hurriedly deport Mr. Khalil was no bona fide act of law enforcement judgment. Instead, as a federal court has separately concluded, the United States' targeting of Mr. Khalil was the product of an unconstitutional Ideological Deportation Policy seeking to punish pro-Palestinian advocacy in general, and Mr. Khalil in particular. The unconstitutional policy was effectuated through a collusive plan between private anti-Palestinian entities, including the Heritage Foundation, Betar USA, and Canary Mission and high level officials at DOS, DHS, and DOJ to identify high-profile non-citizen Palestinian student activists; surveil, dox, and smear them as antisemitic and supporters of terrorism (simply for opposing U.S. and Israeli policy enabling the massacre of Palestinians); and, based on recommendations by these private anti-Palestinian groups, denominate them as targets for arrest, detention, and deportation. Secretary Rubio's Determination that Mr. Khalil should be removed under the so-called Foreign Policy Ground was based exclusively and reflexively on the

recommendation of these anti-Palestinian groups solely to "staunch public protest related to Israel's treatment of Palestinians."[2]

**A. Private Anti-Palestinian Groups' Plan to Collude with Federal Officials to Punish Mr. Khalil in Order to Silence Constitutionally Protected Palestinian Advocacy**

19. Soon after Israel began its military assault on Gaza following the Hamas-led attacks on October 7, 2023, and the corresponding proliferation of student protests against U.S. support for the destruction of Gaza, soon-to-be presidential advisor Stephen Miller publicly expressed his eagerness to punish Palestinians and their supporters through arrest and deportation. He worked in partnership with the D.C.-based Heritage Foundation to plan the campaign to target noncitizen students advocating for Palestine via arrest, detention, and deportation.

20. Due to his public activism in support of Palestinian human rights, Mr. Khalil became the target of racist and violent threats from various groups and individuals who falsely labeled him a terrorist threat and called for his deportation. This included extremist anti-Palestinian hate groups such as Canary Mission, Betar USA, and the Heritage Foundation, each of which coordinated with high-level federal government officials to ensure activists were arrested, detained, smeared, and deported.

21. The Heritage Foundation and two of its leaders, Victoria Coates and Robert Greenway, both of whom were former advisors to President Trump, led the formulation of the Project Esther Blueprint. The Blueprint was a document that described a plan to identify and target pro-Palestinian, non-citizen students and scholars, who would then be arrested and deported by the federal government. As agreed under this "public-private partnership," Canary Mission and Betar

---

[2] *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 187 (D. Mass. 2025), *judgment entered*, No. 25-10685-WGY, 2026 WL 524753 (D. Mass. Jan. 22, 2026), *appeal filed*, No. 26-1195 (1st Cir. Feb. 24, 2026).

USA, who have for years both been steeped in anti-Palestinian animus and vitriol, selected the targets—certain Palestinians and their supporters, including Mr. Khalil—for federal officials to punish, after doxxing and publicly smearing them as antisemitic and supportive of terrorism.

22. Pursuant to the Blueprint, Betar USA and Canary Mission recommended to the State Department that Mr. Khalil should be a target of the broader collusive plan to arrest, detain, and deport noncitizens advocating for Palestine.

23. Those groups and Stephen Miller had a particular fixation on targeting Columbia University students, as the University became the national hotbed for campus protests, including a peaceful encampment protesting the U.S. and Columbia's support for the ongoing genocide in Gaza. Mr. Khalil was perceived as a leader of the campus protests, though his role was primarily to serve as a selected mediator between the administration and the students engaged in the encampment to help negotiate a solution to the respective parties' interests.

24. For its part, Columbia University actively contributed to an environment where Palestinian students and their supporters were demonized. The University also formed a secret disciplinary body which nearly exclusively investigated student advocates for Palestinian rights— including for such offenses as drafting an op-ed in a student newspaper, putting up stickers off campus, and hosting an art exhibition—and which accepted anonymous complaints and required students to sign a non-disclosure agreement to see the unredacted evidence against them. The University deployed chilling surveillance tactics against its students by hiring private investigators to monitor and question students about their pro-Palestinian political activity on campus and using CCTV footage and data from student ID swipes to track and punish student protestors. And it willingly cooperated with a Congressional House investigation, relinquishing student disciplinary records and handing over tens of thousands of pages of documents to the federal government.

25. The harassment of Mr. Khalil on campus was so pervasive that he emailed the Columbia University administration repeatedly asking for support. On Friday, March 7, 2025, Mr. Khalil wrote to Interim President Katrina Armstrong at Columbia University describing the vicious and dehumanizing campaign against him, stating that he was not able to sleep fearing ICE or other dangerous individuals would target him and his family and urging Interim President Armstrong to provide legal support and other protections.

26. Within two days of public statements from Canary Mission identifying Mr. Khalil as a "foreign national," Secretary Rubio made a determination that Mr. Khalil should be removed under the Foreign Policy Ground for no reason other than his advocacy for Palestine, which was, according to the collusive plan, falsely equated with antisemitism and support for terrorism. Canary Mission, as well as Betar USA and the Heritage Foundation, proudly boasted of their role in the arrest and detention of Mr. Khalil and at least eight other non-citizen student advocates for Palestinian human rights.

**B. The Federal Government's Plan to Punish Non-Citizen Palestinian Student Advocates in Order to Silence Criticism of Israeli and U.S. Policy**

27. During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized Israel's actions. For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of [those] Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."

28. While the Gaza Solidarity encampments at college campuses took place in the spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You

10

know, there are a lot of foreign students. As soon as they hear that, they're going to behave." Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "[c]ancel the visa of every foreign national out there supporting Hamas and get them out of America."[3]

29. On his first day in office, January 20, 2025, President Trump signed Executive Order 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025). It proclaimed that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security" and those who "bear hostile attitudes toward [U.S.] citizens, culture, government, institutions, or founding principles." On January 29, 2025, President Trump signed Executive Order 14188, "Additional Measures to Combat Anti-Semitism." Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025). It states that the Trump administration will investigate "post-October 7, 2023, campus anti-Semitism."

30. On that day, Betar USA doxxed Mr. Khalil on X and called for his deportation. The next day, the White House published an accompanying fact sheet to the Executive Order parroting the language of the Heritage Foundation's Project Esther Blueprint. It describes the Executive Order as targeting "leftist, anti-American colleges and universities," and makes a "promise" to "Deport Hamas Sympathizers and Revoke Student Visas," sending a clear message to all "resident

---

[3] Marco Rubio (@marcorubio), X (Oct. 15, 2023), https://x.com/marcorubio/status/1713652113098539120 [https://perma.cc/N479-N5QC].

aliens who joined in the pro-jihadist protests" that the federal government "will find you . . . and [] deport you."[4]

31.    "Pro-jihadist protest" is a pretextual smear for pro-Palestinian protests of the kind that had been growing across the country in the prior months, especially on college campuses.

32.    Any pretense that Trump's Executive Orders attempting to punish supposed antisemitism were other than pretext for punishing constitutionally protected speech critical of Israel's subjugation of Palestinians was wholly discredited by the federal court in *American Association of University Professors v. Rubio ("AAUP")*. After a two-week trial with numerous witnesses, the *AAUP* court held that, "although couched in a concern for hateful ideologies, antisemitism, and antisemitic harassment . . . [the Orders] in fact incorporated a definition of antisemitism that encompassed protected political speech, and, by means of intentionally discriminatory enforcement procedures implementing them, led to the singling out of pro-Palestine and anti-Israel speech for a campaign of speech-chilling retribution." 802 F. Supp. 3d at 186. The *AAUP* trial specifically documented that the State Department acted upon private entities' recommendation and hurriedly denominated Mr. Khalil as removable under the Foreign Policy Ground, without deliberation and based on nothing other than his constitutionally protected advocacy.

**C.    The United States Government's Targeting of Mr. Khalil to Punish Him and Chill Palestinian Advocacy**

33.    The United States' attempted "prosecution" of Mr. Khalil—in the form of arrest, detention, and deportation—was driven by a retaliatory and punitive intent serving broader

---

[4]    The White House, Fact Sheet: President Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

political and public relations interests, not any legitimate law enforcement purpose, as multiple federal courts have found in ruling these prosecutions unconstitutional. As described above, Mr. Khalil's arrest and attempted deportation was undertaken pursuant to a broader policy by United States officials to retaliate against student activists for exercising their constitutionally protected rights to free expression in a manner critical of U.S. foreign policy in support of Israel's onslaught on Palestinians in Gaza.

34. On March 6, 2025, Secretary Rubio posted on X, "Those who support designated terrorist organizations, including Hamas, threaten our national security. The United States has zero tolerance for foreign visitors who support terrorists. Violators of U.S. law — including international students — face visa denial or revocation, and deportation."[5] Secretary Rubio was following the collusive plan set forth by Project Esther—to intimidate pro-Palestinian protestors into silence.

35. On the same day, federal officials began the process of attempting to deport Mr. Khalil based on lies, innuendo, and tabloid headlines. Homeland Security Investigations ("HSI"), the principal investigative branch of DHS, issued a Report of Analysis ("ROA") for Mr. Khalil, citing articles, including from tabloids, that had smeared him for alleged antisemitism and for appearing at protests where others supposedly endorsed Hamas. The only evidence contained in the ROA in support of the ultimate determination, however, was that he had been critical of Israel and participated in protests at Columbia University.[6]

---

[5] Secretary Marco Rubio (@SecRubio), X (Mar. 6, 2025), https://x.com/SecRubio/status/1897776709778211044 [https://perma.cc/E8JW-H9L2].

[6] Trial Exhibit 233, *AAUP*, 802 F. Supp. 3d 120 (D. Mass. 2025) (No. 1:25-cv-10685-WGY), ECF No. 315-15.

36.     The next day, March 7, the National Security Division ("NSD") at DHS signed a letter to the Director of Field Operations at DOS requesting that the Secretary of State determine whether there are adverse foreign policy consequences from Mr. Khalil's presence and activities, consistent with the Foreign Policy Ground, INA § 237(a)(4)(C) [8 U.S.C. § 1227(a)(4)(c)].[7] The memo attached the ROA containing unvetted allegations and described Mr. Khalil as a "prominent pro-Palestinian activist involved in antisemitic activities." It identified that he was a "key figure" and held "leadership roles" in several protests on Columbia's campus. The memo stated that HSI was "concerned" that these activities "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization."[8]

37.     On March 8, the Director of Field Operations at DOS wrote an Action Memo recommending that Secretary Rubio find Mr. Khalil deportable, relying solely on the ROA and the memo from NSD and their corresponding criticisms of his advocacy.[9] Indeed, the Action Memo acknowledged Mr. Khalil's speech was the only grounds for the determination and that "DHS has not identified any alternative grounds of removability that would be applicable . . . including the ground of removability for aliens who have provided material support to a foreign terrorist organization or terrorist activity."[10]

---

[7]     Trial Exhibit 242 at 1–2, *AAUP*, 802 F. Supp. 3d 120 (D. Mass. 2025) (No. 1:25-cv-10685-WGY), ECF No. 315-17.

[8]     *Id.* at 1.

[9]     Trial Exhibit 247 at 1–5, *AAUP*, 802 F. Supp. 3d 120 (D. Mass. 2025) (No. 1:25-cv-10685-WGY), ECF No. 315-18.

[10]    *Id.* at 3. Further confirming the baselessness of the targeting of Mr. Khalil, on March 19, 2025, the Federal Bureau of Investigation ("FBI") closed a complaint that was opened based on an anonymous tip from March 6, 2025 regarding "potential calls for violence on behalf of HAMAS by Mahmoud Khalil, a Syrian national who attends Columbia University." The regular FBI channels found that the complaint did not warrant further investigation. And on April 15, 2025, the State Department would receive a risk-assessment social media analysis report which it commissioned from Ferretly, a company that describes itself as an "AI-powered social media

38. Nevertheless, that same day, ignoring the unconstitutionality of punishing someone based on constitutionally protected speech, and carrying out the conspiracy, Secretary Rubio made the determination that Mr. Khalil should be subject to removal under the Foreign Policy Ground, INA § 237(a)(4)(C) [8 U.S.C. § 1227(a)(4)(c)].

39. After Mr. Khalil's arrest, the White House itself boasted that the targeting of Mr. Khalil would serve as the "blueprint" for targeting other students.

### D. Mr. Khalil's Unlawful Arrest and Imprisonment

40. On March 8, 2025, plainclothes ICE officers followed Mr. Khalil, who was returning home with his pregnant wife from an iftar—the meal eaten by Muslims after sunset to break the daily fast during Ramadan. The officers pushed their way into the private vestibule of Mr. Khalil's apartment building without a warrant and arrested him.

41. Mr. Khalil's warrantless arrest violated the Fourth Amendment and DHS regulations. He was detained absent any determination of flight risk or danger to the community, let alone any criminal charges or proper legal authority. DHS then deliberately transferred Mr. Khalil rapidly and repeatedly—from New York to New Jersey, then Texas, and finally rural Louisiana, 1,300 miles from his family and attorney, in a manner designed to conceal his location so as to avoid ordinary legal process or prompt judicial review of the government's ultimately unconstitutional actions.

42. In the course of his arrest, Mr. Khalil's arresting officer informed him that his "student visa" had been "revoked" by DOS—even though Mr. Khalil was an LPR and not a visa holder. When Mr. Khalil's attorney informed the arresting agents that he was an LPR and not a visa holder, the agent simply responded that Mr. Khalil's LPR status was being "revoked" too.

---

background screening" platform. The report found no behaviors associated with prejudice, threats, or images of weapons or other violence.

Similarly, when Mr. Khalil's wife presented a DHS agent with documents confirming Mr. Khalil's LPR status, the DHS agent said "he has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

43. Soon after his arrest, Mr. Khalil was processed at 26 Federal Plaza in New York City, then transferred to a detention center in Elizabeth, New Jersey. His attorneys filed a habeas petition at 4:40 a.m., in the Southern District of New York, based on evidence in the ICE Locator showing Mr. Khalil's location in New York City. Without updating the ICE Locator, federal officials swiftly transferred Mr. Khalil to an immigration jail in Jena, Louisiana.

44. This transfer was calculated by officers of the United States to ensure that any final order of deportation issued against Mr. Khalil by the immigration courts could be immediately executed without federal court review. The Second Circuit Court of Appeals often grants stays of final removal orders issued by immigration courts pending federal court review, and it is that court that would have reviewed Mr. Khalil's immigration case if he was detained, as he should have been, near his home. On the other hand, the Fifth Circuit Court of Appeals, where Mr. Khalil's immigration case now is, rarely ever grants such stays. In other words, this transfer was the first step in the United States government's manipulation of Mr. Khalil's immigration proceedings to ensure they could have maximal power to control his removal proceedings and ensure his swift deportation from the United States without judicial review.

45. Finally, confirming the administration's punitive and malicious intent, numerous officials wantonly defamed Mr. Khalil as a terrorist sympathizer and antisemite and promised more such arrests of activists to send a message more broadly that the United States intends to unconstitutionally suppress speech in support of Palestine.

46.     One day after Mr. Khalil's arrest, on March 9, 2025, Secretary Rubio stated, "[w]e will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[11] Also that same day, the White House mocked Mr. Khalil by posting on X, "SHALOM, MAHMOUD," and quoted Trump's earlier statement that Mr. Khalil was being arrested for supposed support for terrorism.[12]

47.     On March 13, 2025, DHS Spokesperson Troy Edgar stated that Mr. Khalil was arrested because "he's put himself in the middle of the process of basically pro-Palestinian activity."[13] In so doing he, like the other officers of the United States, suggested that Mr. Khalil's arrest was the state's attempt to punish "pro-Palestinian" speech.

48.     While Mr. Khalil was being transferred between different detention facilities, DHS withheld his ulcer medication, shoes, jacket, belt, blanket, and pillow for approximately two days, causing unnecessary hardship and distress without a legitimate purpose. The government's threats, concealment, denial of counsel, and medical neglect constitute intentional and/or negligent acts outside the regular course of immigration enforcement, demonstrating malice and abuse of the immigration removal process as a tool of punishment.

### E.     The Government Abused the Immigration Process to Punish Mr. Khalil Because of His Protected Political Speech

49.     Following his detention, Mr. Khalil was placed in removal proceedings at the LaSalle Immigration Court in Jena, Louisiana. On March 9, 2025, the government issued Mr. Khalil a Notice to Appear ("NTA"), which claimed Mr. Khalil is subject to removal under the

---

[11]     Marco Rubio (@marcorubio), X (Mar. 9, 2025), https://x.com/marcorubio/status/189858967532441945 [https://perma.cc/FKT6-27Z3].
[12]     The White House (@WhiteHouse), X (Mar. 10, 2025), https://x.com/WhiteHouse/status/1899151926777749618 [https://perma.cc/T9JS-AR4W].
[13]     Michel Martin & Destinee Adams, *DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened*, NPR (Mar. 13, 2025), https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

Foreign Policy Ground, 8 U.S.C. § 1227(a)(4)(C)(i). This statute had never before been used to seek the deportation of a noncitizen on the basis of engaging in First Amendment-protected speech, association, and assembly within the United States, in retaliation for that protected activity. The charge stated without evidence that "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

50.     On March 17, 2025, the same day Mr. Khalil filed a motion for a preliminary injunction in federal court in his habeas case, DHS issued a Form I-261, Additional Charges of Inadmissibility / Deportability, which asserted an additional, post-hoc charge under 8 U.S.C. § 1227(a)(1)(A) alleging he had made misrepresentations on his permanent residency application. DHS added this baseless additional charge only after realizing that the Foreign Policy Ground charges against him were constitutionally dubious, and in order to keep the goal of retribution alive in the event, fully anticipated by the federal government at the time, that a court found the speech-based removal charge impermissible.[14]

51.     The asserted misrepresentations are falsely manufactured and obviously pretextual. For example, DHS accused Mr. Khalil of failing to disclose his status as a "member" of the United Nations Relief and Works Agency for Palestine Refugees ("UNRWA"), despite it not being a membership-based organization, and Mr. Khalil never having been a member of it. Mr. Khalil

---

[14]     *See* Action Memo for the Secretary: (SBU) Determination of Deportability of Mohsen Mahdawi, a U.S. Lawful Permanent Resident (LPR), under Section 237(a)(4)(C) of the Immigration and Nationality Act (INA), dated March 15, 2025, at 4, *AAUP*, 802 F. Supp. 3d 120 (D. Mass. 2025) (No. 1:25-cv-10685-WGY), ECF No. 315-18 at 9 ("Given the potential that a court may consider his actions inextricably tied to speech protected under the First Amendment, it is likely that courts will closely scrutinize the basis for this determination. We understand that Khalil intends to seek an injunction of the determination in his case, and we could anticipate Mahdawi to do the same.").

completed an internship with UNRWA as part of his graduate program, for which he received a stipend paid for by Columbia, which he disclosed on his application. DHS also falsely claimed Mr. Khalil failed to disclose that he was a "member" of Columbia University Apartheid Divest ("CUAD")—a coalition of campus groups that expressly had no membership—based solely on his role as a negotiator that did not begin until after he submitted his permanent residency application.

52. In proceedings in front of the immigration court, officers of the United States provided no evidence to rebut Mr. Khalil's evidence about the unreliability of the misrepresentation charge and did not ask Mr. Khalil a single question when he provided extensive, credible testimony demonstrating he made no willful, material misrepresentation.

53. The misrepresentation charge was obviously pretextual, as a part of the broader conspiratorial plan to retaliate against Mr. Khalil for his Palestinian advocacy. Indeed, in compiling Mr. Khalil's ROA prior to his arrest, DHS expressly reviewed his adjustment of status application, and was aware of the facts that it later classified as having been misrepresented, yet still determined at the time of compiling his ROA that DHS could "not identif[y] any alternative grounds of removability [other than the Foreign Policy Ground] that would be applicable to [Mr. Khalil]."

54. Seasoned immigration practitioners have characterized the government's issuance of the post-hoc charge against Mr. Khalil as highly unusual—both in timing and substance. This is especially true where the nature of the alleged omissions relates to a failure to disclose student internships or student clubs (*i.e.*, organizations that would have no impact whatsoever on someone's admissibility as a resident to the United States), as was the case for Mr. Khalil.

55. On June 11, 2025, Judge Michael Farbiarz of the U.S. District Court for the District of New Jersey held that the Foreign Policy Ground, as applied to Mr. Khalil through the Rubio

Determination, is unconstitutionally vague and enjoined the government from "seeking to remove [Mr. Khalil] from the United States based on the Secretary of State's determination[.]"[15] Undeterred by this determination of illegality, two days later, DHS represented to the federal court that Mr. Khalil was "now detained based on" the second, post-hoc misrepresentation charge.

56. Like the second post-hoc charge itself, Mr. Khalil's detention on such a charge was highly unusual. Immigration experts confirm that lawful permanent residents are rarely, if ever, detained based solely on the types of missing information as alleged in the second post-hoc charge.[16] As the federal judge presiding over Mr. Khalil's habeas case found, based on overwhelming and unrebutted expert testimony:

> [T]he evidence is that lawful permanent residents are virtually never detained pending removal for the sort of alleged omissions in a lawful-permanent-resident application that the Petitioner is charged with here. And that strongly suggests that it is the Secretary of State's [Foreign Policy Ground] determination that drives the Petitioner's ongoing detention — not the other [misrepresentation] charge against him.[17]

57. Nonetheless, the IJ issued a decision on June 20, 2025, the same day Mr. Khalil was released on bail by Judge Farbiarz, ignoring the district court's injunction and sustaining both charges of removal, denying his asylum application, refusing to consider his request for a

---

[15] *Khalil v. Trump*, 786 F. Supp. 3d 871, 880–81 (D.N.J. June 2025), *vacated sub nom. Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), *reh'g denied*, 176 F.4th 295 (Mem.) (3d Cir. 2026).

[16] Fourth Amended Petition at ¶¶ 114–15, *Khalil v. Trump*, 786 F. Supp. 3d 871 (D.N.J. 2025) (No. 25-cv-01963 (MEF) (MAH)), ECF No. 382. *See also* Declaration of Ira J. Kurzban, *id.*, ECF No. 284-11; Declaration of Stacy Tolchin, *id.*, ECF No. 284-12; Declaration of Kerry E. Doyle, *id.*, ECF No. 284-16; Declarations of Andrea Saenz, Dana Leigh Marks, and Ryan Wood in Support of Motion to Reopen Removal Proceedings, *Matter of M-K-*, 29 I&N Dec. 556 (BIA 2026), *available at* https://www.aclu.org/cases/khalil-v-trump#legal-documents.

[17] *Khalil v. Trump*, 786 F. Supp. 3d at 878.

§ 1227(a)(1)(H) waiver on the second charge, and ordering Mr. Khalil removed to Algeria, or, alternatively, to Syria.[18]

58.     On January 15, 2026, the Third Circuit issued a split panel decision sustaining the government's appeal of Judge Farbiarz's decision on jurisdictional grounds only. The Third Circuit did not reject Judge Farbiarz's finding that Mr. Khalil's detention was unconstitutional; it instead determined that there was no subject-matter jurisdiction to adjudicate Mr. Khalil's constitutional claims.[19] On May 22, 2026, the Third Circuit denied Mr. Khalil's petition for rehearing *en banc*, by a 6-5 vote. 176 F.4th 295 (Mem.) (3d Cir. 2026).

59.     On January 22, 2026, the *AAUP* court released a collection of documents produced in discovery during a bench trial, many of which were relevant to Mr. Khalil's case. Assessing these documents and Mr. Khalil's case, the court found, by clear and convincing evidence, that the government enacted an unlawful Ideological Deportation Policy—that is, targeting pro-Palestinian noncitizen student activists, with the goal of chilling such protected expression, specifically to "terroriz[e] similarly situated non-citizen (and other) pro-Palestinians into silence." *AAUP*, 802 F. Supp. 3d at 173. The documents released in January included some, but certainly not all, of the evidence Mr. Khalil sought in his discovery requests before the IJ. The court made findings particular to Mr. Khalil, namely that he was an early target of the Ideological

---

[18]     Thereafter, the immigration courts, including the BIA, were operationalized by officers from EOIR and DOJ via outrageous procedural irregularities, executive-agency control, and transparent race-to-the-finish speed, contrary to law and agency procedure, to ensure a pre-ordained result of removal in Mr. Khalil's case. The agency's co-optation and control of those immigration proceedings, much of which occurred subsequent to the administrative complaint Mr. Khalil has already filed, continue the United States' abuse of process. On July 18, 2026, Mr. Khalil filed an administrative complaint to DOJ and EOIR setting forth the facts supporting the agencies' perpetuation of these torts. Mr. Khalil intends to amend his Complaint after exhausting the administrative process to include relevant facts and claims relevant to those agencies' actions.
[19]     *Khalil v. President*, 164 F.4th 259, 273–74, 280 (3d Cir. 2026).

Deportation Policy and the Rubio Determination made against him was designed to more broadly chill student activism supporting Palestinian human rights.

## III. THE UNITED STATES GOVERNMENT HAS CAUSED MR. KHALIL EXTREME EMOTIONAL DISTRESS

60. Mr. Khalil experienced severe emotional harms as a result of the conduct of federal employees, officials, and agents.

61. Anonymous federal agents pushed their way into the vestibule of Mr. Khalil's home without a warrant and arrested him in front of his terrified and expectant wife. While holding him in detention in New York and New Jersey, the agents refused him access to his wife or to legal counsel. Thereafter, they rushed to get him out of the New York and New Jersey area to avoid the jurisdiction of federal courts there, and spirited him to an ICE detention facility in Louisiana, all while refusing to explain to Mr. Khalil what was happening to him or why. While he was being driven in the dark of night by these federal agents, Mr. Khalil experienced his unexplained late-night abduction as a kidnapping and genuinely feared for his life. During this time, he also experienced extreme distress and worry about his safety and the safety of his eight-months-pregnant wife.

62. While in ICE detention for 104 days, Mr. Khalil experienced intense anxiety and worry about the uncertainty of his circumstances and from the confusion of a detention based solely on his lawful conduct. He also experienced intense stress and worry about the health and safety of his expectant wife and, eventually, his newborn child and what would come of him and his family if he were deported for nothing more than lawful advocacy. Throughout his detention, he experienced extreme anxiety about his own safety and the possibility of abrupt deportation and harm given the already illegal circumstances of his detention and widespread Trump administration practices of rendering persons abroad without legal process.

63.     Exacting this punishment and stress was the goal of the federal officials. When Mr. Khalil's federal habeas judge ruled his detention on the Foreign Policy Ground unconstitutional, which would normally necessitate his release, DHS officials shifted gears and insisted he was nevertheless being detained on the alternative, pretextual and post-hoc misrepresentation charges they had lodged for the very reason that the Foreign Policy Ground was of dubious constitutionality. It is nearly unprecedented for DHS to detain a lawful permanent resident on mere nonmaterial misrepresentation charges, particularly when the LPR has a U.S.-citizen spouse and strong connections to the United States. Nevertheless, DHS persisted in its goal of unlawfully detaining Mr. Khalil, to send a retributive and chilling message regarding advocacy for Palestinian rights. Eventually, a federal judge, over DHS's objections, ordered Mr. Khalil released on bail, after 104 days of detention.

64.     While unlawfully detained by the United States, Mr. Khalil was prevented from being with his wife during the birth of their first child. Instead of holding his wife's hand in the delivery room, Mr. Khalil was crouched on a detention center floor, whispering through a crackling phone line as she labored alone. Mr. Khalil listened to his wife's pain through a government-monitored call and tried to comfort her while 70 other men slept around him. When Mr. Khalil heard his son's first cries, he buried his face in his arms so no one would see him weep. Being deprived of this moment—the opportunity to hold his newborn child and welcome him into the world—has been emotionally devastating for Mr. Khalil. His inability to be present for the birth of his first and only child and to care for him and his wife in the days after his birth caused Mr. Khalil extreme anguish, with lingering effects to this day.

65.     The first time Mr. Khalil saw his son in person was through a plate-glass window. DHS denied Mr. Khalil a furlough to attend the birth of his son. And, defying agency practice and

23

regulation, DHS refused to permit a contact visit with his wife and son, even as his wife traveled 1,300 miles for such a meeting. Meeting his firstborn through a physical barrier, unable to hold, hug, or bond with him in what was already a sterile, heavily guarded environment, was emotionally agonizing for Mr. Khalil. Mr. Khalil's lawyers petitioned the federal court, which ordered a contact visit with Mr. Khalil's wife and child; accordingly, four weeks after his child's birth, Mr. Khalil was permitted to hold him for the first time for only one hour. The sudden shift from the long-awaited and hard-fought physical connection with his son back to the cold, institutional isolation triggered a deep and lingering sense of grief and anxiety in Mr. Khalil.

66. In addition to missing his son's birth and the precious first month of his life, Mr. Khalil was deprived of the opportunity to attend his own graduation from Columbia in May 2025. Rather than walking across the stage in celebration of his academic achievements, surrounded by family and loved ones who understood the effort and sacrifice it took for him to arrive at this milestone, Mr. Khalil was languishing in immigration detention in Louisiana, thousands of miles away from the community he spent years building. This was deeply painful for Mr. Khalil, as he was singled out, isolated from his peers, and denied the visual and auditory culmination of his academic journey.

67. Mr. Khalil and his family have endured significant harassment as a result of his arrest and detention. To this day, Mr. Khalil fears for his and his family's safety due to the U.S. government's labeling of Mr. Khalil as a U.S. foreign policy concern, as well as their public, deeply racist, and false accusations that Mr. Khalil supports Hamas or has engaged in antisemitic activity. Mr. Khalil must now arrange for security personnel at public events, and often opts out of attending events altogether out of fear for his safety.

68.     As a result of the U.S. government's actions, Mr. Khalil—and by extension, his wife and infant son—have become targets for attack and surveillance by government agencies, as well as by private actors.

69.     The government's reputational harm has caused and continues to cause Mr. Khalil severe emotional distress. Both after Mr. Khalil's arrest and after the IJ upheld the Rubio Determination, the White House and President Trump issued public statements openly celebrating his deportation. Seeing mugshot-style images of himself circulating from the highest levels of the U.S. government—accompanied by inflammatory language and grotesque and false accusations— was deeply painful and humiliating for Mr. Khalil. Below are just two of the social media posts that Mr. Khalil saw:



70.     While he was detained because of the Rubio Determination, and because of the government's intimidation tactics and stated intent to punish him for his speech, Mr. Khalil was unable to protest the ongoing genocide of his people—the Palestinian people—a fundamental aspect of his freedom of expression.

71. Beyond his detention, the Rubio Determination and the government's targeting of Mr. Khalil continues to hang over him. Mr. Khalil lives under extreme fear that any expressive activity he undertakes will result in further punishment—that his words will be mischaracterized, used against him, or labeled as further evidence of wrongdoing.

72. Mr. Khalil continues to struggle finding peace and calm in his everyday life. He lives in a constant state of hypervigilance, frequently looking over his shoulder and checking his surroundings for law enforcement, surveillance, or threats to his safety. He is particularly afraid of going out alone with his now one-year-old son. And even in his private moments, Mr. Khalil struggles to focus and frequently experiences insomnia and nightmares.

73. The U.S. government's labeling of Mr. Khalil as a terrorist is now embedded in government systems and records—including DHS databases, consular files, and likely even diplomatic cables.

74. Prior to the Rubio Determination and his consequent arrest and detention, Mr. Khalil planned to work in diplomacy and international affairs, whether at the United Nations ("UN") or at a diplomatic mission. In fact, just days before his arrest, Mr. Khalil had accepted a position at Oxfam International as a Palestine and Middle East/North Africa Policy Advisor. In this role, he was set to work towards helping to uphold international law and human rights at the UN. Mr. Khalil was scheduled to start this job in April 2025. Yet, after nearly a month of federal officials' defamatory campaign and Mr. Khalil's arrest and detention, Oxfam International formally revoked its employment offer to Mr. Khalil.

75. The government's actions—including its public targeting of and defamatory statements regarding Mr. Khalil—have resulted in irreparable damage to Mr. Khalil's professional

career. This has caused Mr. Khalil severe emotional distress, pain, and anxiety as he navigates uncertainty regarding professional aspirations he has spent over a decade pursuing.

76. Mr. Khalil has also suffered relational harms as a result of the government's unlawful conduct. For example, his mother had applied for a U.S. visa so she could be present for the birth of Mr. Khalil's son, and her first grandchild, and to attend Mr. Khalil's graduation ceremony. Although her visa was approved in March 2025, the U.S. embassy later refused to further process her visa, saying her case was under administrative processing. The visa was later denied in June 2026. The timing of this change was directly correlated with the Rubio Determination and Mr. Khalil's arrest and detention.

77. Mr. Khalil also fears he will no longer be admitted into Germany to see his father, who is 70 years old and severely disabled. This is deeply devastating for Mr. Khalil. He worries he will never be able to see some members of his family again due to the United States government's actions.

78. In sum, Mr. Khalil's life has been totally upended. He lives every day in fear of being rearrested or deported, or physically harmed—whether by government officials themselves or by someone incited to violence by the government's smears against him. He is not able to live with a semblance of normalcy or peace.

**CLAIMS FOR RELIEF**

**COUNT I: False Arrest and False Imprisonment**

79. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

80. Under New York law, claims of false arrest and false imprisonment are synonymous. To prevail on either claim, a plaintiff must prove that (1) the defendant intended to

confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. Confinement is privileged if the arresting officers had the requisite legal justification for making the arrest.

81. The basis of Mr. Khalil's arrest was pretextual and unlawful. As the foregoing allegations demonstrate and as federal courts in Mr. Khalil's habeas case and in the *AAUP* litigation have found, the decisions to arrest and detain Mr. Khalil were unconstitutional insofar as they constituted retaliation for his constitutionally protected advocacy and were otherwise void for vagueness in violation of Mr. Khalil's due process protections. They were also pretextual insofar as they were not based on any bona fide law enforcement determination of harm or danger, but rather driven by a coordinated effort with private anti-Palestinian groups to punish Mr. Khalil and other noncitizen Palestinian advocates so as to silence pro-Palestinian advocacy more broadly.

82. During Mr. Khalil's arrest, DHS agents believed and stated that the ground for his arrest was that his "student visa" was being "revoked." When his wife showed the agents that Mr. Khalil had a green card, not a visa, the agents stated incorrectly that the green card was being "revoked" as well. The grounds for Mr. Khalil's arrest shifted because the plan to arrest and detain were pretextual and outcome-oriented, regardless of whether they had the requisite probable cause to do so. Accordingly, their actions were not privileged for purposes of false arrest and false imprisonment. Furthermore, the Rubio Determination and Foreign Policy Ground cannot provide valid bases to arrest and confine Mr. Khalil for purposes of false arrest and false imprisonment.

83. Under the FTCA, the United States is liable to Plaintiff Mr. Khalil for false arrest and false imprisonment.

**COUNT II: Abuse of Process**

84. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

85. Under New York law, abuse of process occurs when a defendant employs regularly-issued legal process to compel performance or forbearance of some act, with intent to do harm without excuse or justification, and in order to obtain a collateral objective that is outside the legitimate ends of the process.

86. The federal employees, officials, and agents referenced above abused legal processes within their control for the unlawful purposes of retaliating against Mr. Khalil by invoking a Foreign Policy Ground for the first time against someone engaged in constitutionally protected advocacy. They did so not based on any reasoned deliberation, but pursuant to a coordinated plan devised by the Heritage Foundation and carried out by anti-Palestinian groups and State Department officials for the intended purpose of punishing him for what is otherwise constitutionally protected speech and advocacy and to send a chilling message to Mr. Khalil and other student activists that advocacy on behalf of Palestinian rights would be met with maximal state repression. Using a legal process not for a bona fide ground, but for an ulterior, retributive goal is the hallmark of the tort of abuse of process. In addition, agency officials bypassed agency rules and regulations to add additional harm to Mr. Khalil by not permitting him a furlough or a contact visit with his wife and son.

87. Moreover, Defendant's agents acted with great haste to move Mr. Khalil into a faraway detention facility in order to keep him from accessing family and counsel and to ensure a jurisdiction in the immigration courts and federal courts more favorable to the government. Federal officials used the immigration process to punish Mr. Khalil on the expectation that they would be

able to control the outcome of that process and to ensure his removal would be foreordained. A week later, Defendant engaged in further retaliatory action by adding new pretextual allegations and sought to detain Mr. Khalil on the new misrepresentation charge, all contrary to longstanding precedent and practice that mandates LPRs not be detained based on such nonmaterial allegations of misrepresentation.

88.     Mr. Khalil was injured by Defendant's agents' misconduct, including but not limited to Defendant's agents arresting and detaining him, depriving him of the opportunity to be with his wife during the birth of their first child, and denying him a fair adjudication of his immigration proceedings.

89.     Under the FTCA, the United States is liable to Mr. Khalil for abuse of process.

**COUNT III: Intentional Infliction of Emotional Distress**

90.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

91.     Under New York law, intentional infliction of emotional distress occurs where (1) the defendant engages in extreme and outrageous conduct, (2) with intent to cause, or with disregard of a substantial probability of causing, severe emotional distress, (3) there is a causal connection between the conduct and injury, and (4) the plaintiff suffers severe emotional distress.

92.     The entirety of the process of targeting, arresting, detaining and attempting to deport Mr. Khalil was intended to inflict maximal distress upon Mr. Khalil, and by so horribly punishing him, send an *in terrorem* message to others who might dare to protest in support of Palestinian rights. Indeed, the White House itself boasted that the arrest and detention of Mr. Khalil was designed to make an example out of him and that his arrest would serve as a "blueprint" for the arrest of other noncitizen advocates.

30

93. The federal employees and officers referenced above intentionally or recklessly engaged in extreme and outrageous conduct by abducting Mr. Khalil without a warrant in the vestibule of his apartment and in front of his wife who at the time was eight months pregnant; repeatedly transferring him across jurisdictions, and ultimately detaining him in Louisiana, thousands of miles away from his attorneys and wife; weaponizing the immigration system against Mr. Khalil as punishment and retaliation for Mr. Khalil's legally protected speech; forcing Mr. Khalil to miss the birth of his first-born child while he remained in detention; and slandering Mr. Khalil's reputation by labeling him a U.S. foreign policy concern, and as antisemitic and sympathetic to terrorism. Indeed, he was publicly mocked and defamed by the White House itself, which was all designed to maximize Mr. Khalil's distress and make an example of him for others.

94. Defendant's agents intentionally undertook these actions for the improper purpose of causing Mr. Khalil severe emotional distress, making an example out of him, and frightening other noncitizens who were engaged in similar protected speech in support of Palestinian rights.

95. Mr. Khalil suffered severe emotional distress and mental anguish as a result of the agents' conduct. This includes the profound pain, trauma, and anxiety of being ripped away from his eight-months-pregnant wife without prior notice; spending 104 days unlawfully in detention thousands of miles from family and counsel, being deprived from witnessing the birth of his first child; and missing the opportunity to assist his wife and bond with their newborn son during the early months of his son's life.

96. Mr. Khalil also endured the pain, fear, and humiliation of federal officers and officials falsely smearing him as antisemitic and sympathetic to terrorism as well as designating U.S. foreign policy concern based on his advocacy for Palestinian human rights. As a result, Mr.

Khalil continues to endure public stigma, harassment, threats to his and his family's safety, and damage to his career and reputation.

97.     U.S. agents were acting within the scope of their employment when they inflicted emotional distress on Mr. Khalil.

98.     Under the FTCA, the United States is liable to Mr. Khalil for its employees' intentional infliction of emotional distress.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Mr. Khalil prays for judgment against Defendant as follows:

a.  Award Mr. Khalil all available compensatory damages in an amount to be proven at trial;

b.  Award attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

c.  Grant such other relief as the Court deems just and equitable.

Dated: July 20, 2026                    Respectfully submitted,

/s/Samah Mcgona Sisay
Samah Mcgona Sisay
Baher A. Azmy
Ayla Kadah*
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
ssisay@ccrjustice.org
bazmy@ccrjustice.org
akadah@ccrjustice.org

*Counsel for Plaintiff*

**Pro hac vice* application forthcoming